UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**MARTIN FORTE,**

                              **Plaintiff,**

            v.                                          6:17-CV-264
                                                            (FJS/ATB)

**DIRECT ENERGY SERVICES, LLC,**
a Delaware Limited Liability Company,

                              **Defendant.**
_____

**APPEARANCES**                                     OF COUNSEL

**KAMBERLAW, LLC**                 **ADAM C. YORK, ESQ.**
220 North Green Street                 **MICHAEL J. ASCHENBRENER, ESQ.**
Chicago, Illinois 60607
Attorneys for Plaintiff

**EDISON, MCDOWELL &**           **ANDREW M. EDISON, ESQ.**
**HETHERINGTON LLP**            **HUTSON B. SMELLEY, ESQ.**
First City Tower                       **MICHAEL D. MATTHEWS, JR., ESQ.**
1001 Fannin Street                    **ROBERT P. DEBELAK, III, ESQ.**
Suite 2700
Houston, Texas 77002
Attorneys for Defendant

**FISHKIN LUCKS, LLP**             **STEVEN M. LUCKS, ESQ.**
277 Broadway
Suite 408
New York, New York 10007
Attorneys for Defendant

**SCULLIN, Senior Judge**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Pending before the Court is Defendant's motion to dismiss Plaintiff's First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See* Dkt. No. 24.

**II. BACKGROUND**

A.  **General allegations**

In 1996, New York deregulated its energy market to allow consumers to choose to purchase natural gas and electricity from traditional utilities, like National Grid, or energy services companies ("ESCOs"), like Defendant.  *See* Dkt. No. 18 at ¶ 17.  ESCOs have gained in popularity over the years; and, according to Plaintiff, there are more than one million New York consumers who use an ESCO to purchase their energy.  *See id.*

The New York State Public Service Commission ("NYPSC") still regulates ESCOs; however, unlike traditional utilities, ESCOs are not required to disclose their rates with NYPSC.  *See id.* at ¶ 18.  Switching to an ESCO does not change which company delivers energy to the consumer; rather, "[t]he only difference to the customer is which company sets the price for the customer's energy supply."  *See id*. at ¶ 19.  ESCOs charge customers according to usage, *e.g*., based on the number of kilowatt hours, kWH.

In 2009, New York's legislature passed the ESCO Bill of Rights, which provides certain enumerated protections against deceptive acts and practices.  *See id*. at ¶ 21 (citing N.Y. Gen. Bus. Law § 349-d(3)).  Moreover, the ESCO Bill of Rights requires that, "'[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such

contracts, all variable charges shall be clearly and conspicuously identified.'" *See id.* (quoting N.Y. Gen. Bus. Law § 349-d(7))

Plaintiff alleges that Defendant advertises that its "'fixed New York electricity rates give you freedom from price fluctuations imposed by your utility,' but it fails to adequately inform consumers who switch that once their low 'teaser' rate expires their energy rates can skyrocket." *See id*. at ¶ 23. In that vein, after the initial fixed-rate period expires, Defendant charges consumers on a variable rate plan, which can be significantly higher than what a traditional utility would charge. *See id*. at ¶ 24. Plaintiff asserts that Defendant's variable rate plans limit Defendant's exposure by shifting the risk of rate fluctuation to the consumer. *See id*. at ¶ 26.

Specifically, Plaintiff alleges that Defendant "fails to: a) adequately inform consumers that a variable rate plan can result in large increases in monthly energy bills when energy prices rise; and b) clearly and conspicuously describe the factors that can cause consumers' energy costs to rise." *See id*. at ¶ 27. In that regard, Plaintiff avers that the agreement between the consumer and Defendant provides the following disclosure regarding variable rates:

> After the Initial Term and during the Renewal Period, Direct Energy will charge you at a variable price per kWh based upon generally prevailing market prices for electricity in the LDU load zone for the applicable period, plus an adder, determined solely by Direct Energy in its discretion. Your variable price will include ancillary charges, cost of capacity, generation, line losses, New York City Utility Tax (when applicable), and other miscellaneous charges.

*See id*. at ¶ 29.

The preceding disclosure is, according to Plaintiff, "buried without highlighting or other emphasis amid the Contract's sea of confusing fine print." *See id.*

Plaintiff further points to an NYPSC Order issued on February 23, 2016, which required ESCOs to "guarantee that customers will pay no more, on an annual basis, than the customer

would have paid as a full service customer of the utility." *See id.* at ¶ 33. However, as Plaintiff acknowledges, the Albany County Supreme Court vacated the NYPSC Order. *See id.* at ¶ 34 & n.2 (citing *Nat'l Energy Marketers Assn. v. N.Y. State Pub. Serv. Commn.*, 53 Misc. 3d 641, 37 N.Y.S.3d 178 (N.Y. Sup. Ct. 2016)).

B.     **Specific allegations regarding Plaintiff**

Plaintiff agreed to a contract with Defendant in December 2014. *See* Dkt. No. 18 at ¶ 35. Defendant sent Plaintiff a Welcome Letter, with a copy of the Terms and Conditions and a Disclosure Statement enclosed. *See id.* at ¶ 36. Plaintiff was originally contracted to pay a fixed price of $0.07890/kWH for the first year of service. *See id.* at ¶ 37. The Disclosure Statement further stated that "[Defendant] will send you a renewal notice between 30 and 60 days prior to the end of your Initial Term. This Agreement shall automatically renew for successive month-to-month periods at our standard variable rate plan as per the price applicable to the Terms and Conditions." *See id.*

According to Plaintiff, his "fixed rate electricity supply plan with [Defendant] automatically converts to a variable rate without any action required by [him]." *See id.* at ¶ 38. In explaining the variable rate Plaintiff should expect at the end of his initial contracted period of service, the Terms and Conditions state as follows:

> 6. Price: the Rate and Daily Fee. During the Initial Term, your rate per kWh will be as set forth on the Customer Disclosure Statement. . . . For variable rate, each month will reflect the cost of electricity, including energy, capacity, settlement, ancillaries, related transmission and distribution charges and other market-related factors; plus all applicable taxes, fees, charges, costs, expenses and margins. You may also be charged a flat daily fee, which you will find in the Customer Disclosure Statement. After the Initial Term and during the Renewal Term, your rate per kWh, as well as the daily fee, will both be variable, and will not change

> more than once each monthly billing cycle, unless we send advance written notice indicating otherwise.  Each will change as we solely determine based on business and market conditions, and will not increase more than 40% over the rate for previous monthly billing cycle.

*See id*.

Plaintiff argues that Defendant's disclosure "is not clear or simple, and it does not clearly and conspicuously identify all variable charges, as required by law." *See id*. at ¶ 39.  Plaintiff also alleges that he did not receive a renewal notice at least thirty days prior to the contract renewal that identified all variable charges. *See id.* at ¶ 41.  Finally, Plaintiff asserts that, as a result of Defendant's conduct, he was injured because he paid more for the variable rate than he would have from an alternative energy supplier. *See id*. at ¶ 43.  In that regard, Plaintiff contends that he paid $822.14 more than he would have with National Grid. *See id.*

Based on the foregoing, Plaintiff asserts two causes of action against Defendant.[1]  First, Plaintiff asserts that Defendant violated New York Business Law § 349-d(7), which provides that, "'[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified.'" *See id*. at ¶ 56 (quoting N.Y. Gen. Bus. Law § 349-d(7)).  Plaintiff argues that none of Defendant's materials adequately disclose that Defendant charges a variable rate or explain how that rate is calculated. *See id*. at ¶¶ 57-58.

Second, Plaintiff contends that "Defendant has been unjustly enriched by charging its residential and small business customers more than they would have paid as full service utility customers, while providing them with nothing of value in return for their higher payments." *See*

---

[1] Plaintiff brings this case as a putative class action; however, the subject of Defendant's motion to dismiss is Plaintiff's personal claims.

*id.* at ¶ 70.  Specifically, Plaintiff contends that he paid $822.14 more than he would have if he had maintained service directly via National Grid.  *See id.* at ¶ 71.

Defendant's motion seeks dismissal of each of Plaintiff's claims.  Generally, Defendant argues that Plaintiff's N.Y. Gen. Bus. Law § 349-d(7) claim fails as a matter of law because Defendant complied with that law's requirements.  Further, Defendant contends that Plaintiff's unjust enrichment claim fails because there is an adequate remedy in contract and at law.

### III. DISCUSSION

A.  **Standard of review**

Courts use a two-step inquiry when addressing a Rule 12(b)(6) motion.  "First, they isolate the moving party's legal conclusions from its factual allegations."  *Hyman v. Cornell Univ.*, 834 F. Supp. 2d 77, 81 (N.D.N.Y. 2011).  Second, courts must accept factual allegations as true and "determine whether they plausibly give rise to an entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  A pleading must contain more than a "blanket assertion[ ] of entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007).  Thus, to withstand a motion to dismiss, a pleading must be "plausible on its face" such that it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citation omitted).

Furthermore, when addressing a Rule 12(b)(6) motion, a court may "consider documents attached to or incorporated by reference in [a] complaint[.]"  *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (citation omitted).  Even where "'a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may . . . take the document into consideration in deciding the

defendant's motion to dismiss, without converting the proceeding to one for summary judgment." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (quotation omitted).

In this case, the Court will consider Plaintiff's First Amended Complaint and the two exhibits annexed to the complaint, including the Terms and Conditions and the Welcome Letter, with enclosures, he received when he signed up for service. *See* Dkt. Nos. 18-1, Terms and Conditions; 18-2 Welcome Letter.

**B.    New York General Business Law § 349-d(7)**

The parties' disagreement in this case focuses on the proper application of N.Y. Gen. Bus. Law § 349-d(7), the full text of which is as follows: "In every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified." N.Y. Gen. Bus. Law § 349-d(7).  In short, § 349-d(7) requires that an ESCO "clearly and conspicuously" disclose information regarding variable charges on some, but not all, communications it has with its customers and prospective purchasers.  Consequently, the Court's inquiry is two-fold.  First, the Court must determine whether the material in question qualifies as a contract or as "marketing materials provided to prospective purchasers of such contracts." *Id.*  Second, the Court must consider whether those qualifying materials clearly and conspicuously disclose "all variable charges." *Id.*

### *1. Marketing materials provided to prospective purchasers*

In his First Amended Complaint, Plaintiff has identified the following materials for the Court's consideration: "NEW YORK RESIDENTIAL & SMALL COMMERCIAL TERMS AND CONDITIONS," *see* Dkt. No. 18-1, (hereinafter, "Terms and Conditions"), Welcome Letter, with attached Terms and Conditions and "DIRECT ENERGY CUSTOMER DISCLOSURE STATEMENT FOR ELECTRICITY OR NATURAL GAS," *see* Dkt. No. 18-2, (hereinafter, "Welcome Letter" and "Disclosure Statement"), and website marketing materials annexed to the First Amended Complaint, *see* Dkt. No. 18 at ¶ 25.[2] Moreover, in his response to Defendant's motion to dismiss, Plaintiff provided a screen shot, purportedly portraying Defendant's website on June 26, 2017. *See* Dkt. No. 25-1 at 63.

There is no dispute that the Terms and Conditions, the Welcome Letter, and the Disclosure Statement must comply with § 349-d(7). However, the parties disagree as to whether the website screen-shot in Plaintiff's complaint[3] and the screen-shot included in Plaintiff's response to Defendant's motion to dismiss qualify under the first part of the two-part test and/or whether the Court can consider them at this stage of this lawsuit.

---

[2] Plaintiff has included two copies of the Terms and Conditions as exhibits to his First Amended Complaint. One copy is free standing while the other is enclosed in the Welcome Letter. Their language is identical; thus, the Court, when referring to the Terms and Conditions, refers to both documents.

[3] Defendant contends that the Court should not consider the website materials annexed to the First Amended Complaint because Plaintiff failed to allege that he in fact saw those materials or that they existed in 2014. *See* Dkt. No. 26 at 4. However, granting all reasonable inferences in Plaintiff's favor, the Court finds that the website screen-shot's inclusion in the First Amended Complaint and Plaintiff's statement that Defendant provided him with some materials in connection with his order are sufficient to allow the Court to consider the screen-shot for purposes of considering Defendant's motion to dismiss.

The parties generally agree on the approach the Court should use to determine whether § 349-d(7) requires disclosure regarding variable charges. To that end, the parties advocate for a two-part test, requiring disclosure on "(1) . . . all materials directly provided to consumers ('as opposed to, for instance, ads on buses'); and (2) . . . 'only where the material refers to a specific rate structure.'" *See* Dkt. No. 24-1 at 11 (quoting *Mirkin v. Viridian Energy, Inc.*, No. 3:15-1057, 2016 WL 3661106, at *3 (D. Conn. July 5, 2016)); *see also* Dkt. No. 25 at 6 (stating that § 349-d(7) "applies to marketing materials that (1) are provided to prospective purchasers and (2) refer to a specific rate structure").

The aforementioned two-part test is not literally derived from § 349-d(7)'s text. Nonetheless, the plain meaning of § 349-d(7) supports the first limitation, namely, that only materials provided directly to consumers must comply with § 349-d(7). In that regard, the statute requires disclosure on "all marketing materials *provided to prospective purchasers* of such contracts." N.Y. Gen. Bus. Law § 349-d(7) (emphasis added). The use of the word "provided" in the phrase "provided to prospective purchasers" insinuates that, for the materials to be covered, an ESCO must actively distribute such materials to consumers who are likely to purchase a contract for service. Thus, § 349-d(7)'s umbrella does not cover passive and general marketing materials such as a Facebook advertisement, an advertisement on a bus, or a television commercial. Moreover, the word "prospective" is defined as "[a]nticipated or expected; likely to come about." Black's Law Dictionary 1259 (8th ed. 2004). Therefore, to qualify, an ESCO must provide the marketing materials to customers who are likely or soon to become its customers, *i.e.*, not simply a person browsing a website or viewing a brochure.

However, the second proposed limitation, that § 349-d(7) applies only when the marketing materials refer to a specific rate structure, derives exclusively from a case in the

District of Connecticut. The court, in *Mirkin*, based its interpretation of § 349-d(7) on several passages of legislative history and its desire to avoid "the absurd result that [the defendant] would be required to place a discussion of its variable rates on every single marketing item it provided to the public." *Mirkin v. Viridian Energy, Inc.*, No. 3:15-CV-1057, 2016 WL 3661106, *4 (D. Conn. July 5, 2016). The court further accepted the defendant's argument that certain comments from the bill's sponsor supported the additional limitation. *See id.* (stating that "Assemblyman Michael N. Gianaris, a sponsor of the bill, explain[ed] that subsection (7) requires that 'all variable charges must be clearly and conspicuously identified *as such* . . .'" (citation omitted)). The *Mirkin* court also discussed how requiring ESCOs to provide disclosures on all marketing materials could confuse the consumer because some marketing materials would lack context. *See id.* (stating that "[i]t is hard to imagine how requiring such a disclosure would make sense *unless* the document referred to a specific rate structure"). Thus, the court concluded that "the best reading of the statute is that disclosure of a variable rate plan is required only when a *specific* plan is actually being discussed in the contract or marketing materials." *Id*.

The words of the statute, however, do not support the *Mirkin c*ourt's interpretation of § 349-d(7). The statute itself imposes no additional restriction but rather casts a relatively clear net to encompass all marketing materials provided to prospective purchasers. In other words, the *Mirkin* court's interpretation of § 349-d(7) functions as a judicial amendment to the statute. *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1726 (2017) (stating that "the proper role of the judiciary [is] to apply, not amend, the work of the People's representatives"). Furthermore, the single quotation that the *Mirkin* court highlighted from the legislative history is ambiguous at best and should not be used to rewrite an otherwise clear statute. *See Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 302 (2010) (Scalia, J.,

concurring in part and concurring in judgment) (stating that "it is utterly impossible to discern what the Members of Congress intended except to the extent that intent is manifested in the *only* remnant of 'history' that bears the unanimous endorsement of the majority in each House: the text of the enrolled bill that became law").  Finally, the *Mirkin* court's concern to avoid the absurd result that an ESCO would be required to place a discussion of its variable rates "on every single marketing item it provided to the *public*," *Mirkin*, 2016 WL 3661106, at *4, is exaggerated because the first limitation, discussed above, unambiguously limits the statute's reach to ESCO contracts and materials given to prospective purchasers of those contracts, not all material distributed to the *public*.  Thus, the reach of the statute does not cover generalized marketing materials intended for the general public who are not prospective (*i.e.*, "[a]nticipated or expected; likely to come about," Black's Law Dictionary 1259 (8th ed. 2004), purchasers of the ESCO's service.

Faithfully applied, the statute imposes no condition that the particular marketing materials reference a specific rate structure to trigger § 349-d(7)'s requirement that the ESCO disclose its variable charges.  Therefore, the Court finds that § 349-d(7)'s disclosure requirement is triggered in contracts for energy services and in marketing materials directed at prospective purchasers of those contracts.

The marketing materials in the First Amended Complaint depict the following image:



*See* Dkt. No. 18 at ¶ 25.

Plaintiff describes this advertisement as part of a "marketing campaign that promises consumers savings and entices them with free smart thermostats, rewards points, and other incentives to switch, failing to adequately inform consumers that their plan will ultimately switch to [Defendant's] variable rate plans, and that these variable rates can rapidly rise[.]" *See id.*

This excerpted advertisement, however, is nothing more than a common advertiseme3nt designed to peak a consumer's curiosity to investigate Defendant's service. In other words, this advertisement is too general and not directed towards a consumer who is likely to become a

contract purchaser.[4]  Thus, the Court finds that this advertisement need not comply with § 349-d(7)'s disclosure requirement.

As to the website materials included in Plaintiff's response, Defendant contends that, because Plaintiff introduced this screen-shot for the first time in his response, the Court cannot consider it on a motion to dismiss.  In that regard, it is well-settled that a party is not entitled to amend its complaint through statements and exhibits made in its motion papers.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (citation omitted).

In this case, Plaintiff failed to include or even mention the screen-shot he now purports to use as evidence that Defendant's marketing materials do not comply with § 349-d(7).  Moreover, he captured the screen-shot on June 26, 2017; thus, there is no connection between this material and Plaintiff's experience when he first signed up with Defendant in 2014.  Therefore, the Court declines to consider the website screen-shot included in Plaintiff's response to Defendant's motion to dismiss.

### *2. Clear and conspicuous disclosure*

The Court will now consider whether the Terms and Conditions, *see* Dkt. No. 18-1, Disclosure Statement, *see* Dkt. No. 18-2, and Welcome Letter, *see id*., "clear[ly] and conspicuous[ly]" disclose "all variable charges."

---

[4] Plaintiff's argument to the contrary is nonsensical.  Essentially he argues that, because he is no longer a prospective customer, any of the materials he, or members of the class, viewed prior to purchasing should qualify.  *See* Dkt. No. 25 at 6-7.

There are two layers to the Court's inquiry at this step. First, the Court must determine the content of the information that an ESCO must disclose; next, the Court must determine whether Defendant clearly and conspicuously disclosed that information.

With respect to the content of what an ESCO must disclose, Defendant urges the Court to adopt the reasoning of *Mirkin* and *Wise v. Energy Plus Holdings, LLC*, No. 1:11-cv-7345 (S.D.N.Y.), that § 349-d(7) "requires disclosure only of the existence of a variable rate, rather than the basis on which it varies[.]" *Mirkin*, 2016 WL 3661106, at *5. Plaintiff, to the contrary, argues that § 349-d(7) requires an ESCO to disclose "the factors that can cause consumers' energy costs to rise in a variable rate energy plan" to satisfy the statute's remedial purpose. *See* Dkt. No. 25 at 11. Furthermore, Plaintiff asserts that the plain language of the statute, using the plural "variable charges" rather than "variable rate," shows the legislature's intent to require a more robust disclosure. *See id*. Finally, Plaintiff contends that merely requiring an ESCO to disclose when it will charge a variable rate cannot be reconciled with the statute's call for the disclosure to be clear and conspicuous. *See id*.

It is unclear what Plaintiff contends Defendant should disclose in addition to the fact that it charges a variable rate per kWH.[5] By its terms, the statute merely requires the identification of variable charges. In this case, the only variable charge to which Plaintiff was subject was the variable rate for the price of his electric service. *See* Dkt. No. 26 at 3. Although there may be a factual circumstance where an ESCO's service agreement would have multiple variable charges,

---

[5] Plaintiff does, however, make the general claim that Defendant fails to "adequately inform consumers that a variable rate plan can result in large increases in monthly energy bills when energy prices rise; and . . . clearly and conspicuously describe the factors that can cause consumers' energy costs to rise." *See* Dkt. No. 18 at ¶ 27. Regardless of the accuracy of this claim, Plaintiff does not appear to argue that the statute requires such disclosure, only that Defendant's failure to do so is deceptive. However, whether Defendant's actions are deceptive is irrelevant to whether it disclosed all variable charges, as § 349-d(7) requires.

this is a case where Plaintiff has only alleged a single variable charge, *i.e.*, the rate per kWH. Accordingly, the Court finds that § 349-d(7) requires that an ESCO disclose the identity of all variable charges to which a customer is subject; in this case, that means that Defendant must "clearly and conspicuously" disclose that it will charge a variable rate per kWH after the initial contract period.

The Court must finally determine whether Defendant's disclosure satisfies the statute's "clear and conspicuous" requirement. The first document to consider is the Terms and Conditions. Defendant contends that the Terms and Conditions "is just two-and-a-half pages, written in plain English, and can be read in a few minutes -- making it, at most, a pond of clear contract terms." *See* Dkt. No. 24-1 at 13. Despite Defendant's contention to the contrary, the Terms and Conditions do not make any effort to highlight or conspicuously disclose that a variable rate is forthcoming. The relevant section of the Terms and Conditions is reproduced below:

> on the Customer Disclosure Statement. The Initial Term will continue for the number of monthly billing cycles as indicated on the Customer Disclosure Statement. Thereafter, you will be notified in advance that this Agreement will automatically renew on a month-to-month basis at the same terms, unless Direct Energy sends you written notice of proposed changes to such terms in advance of the renewal date (each such renewal are collectively referred to as the "Renewal Term"). Any such written notice will be sent at least thirty (30) days and no more than sixty (60) days prior to the renewal date, apprising you of any proposed changes in the terms and conditions of this Agreement and of your right to renew, terminate or renegotiate this Agreement. If you wish to reject the renewal of this Agreement without incurring an early cancellation fee, if any, you will have three (3) business days from the day you receive the first billing statement of your Renewal Term to cancel by calling us as detailed in Section 27. When receiving service on a month-to-month basis, you may provide written notice of termination or call us as detailed in Section 27 or call LDU to terminate the agreement. We may terminate this Agreement by providing thirty (30) days' written notice to you.
>
> **6. Price: the Rate and Daily Fee.** During the Initial Term, your rate per kWh will be as set forth on the Customer Disclosure Statement. For a fixed or variable rate, your rate per kWh will be for electric generation service and New York City Utility tax (when applicable), and excludes other taxes and regulated charges from the utility, including but not limited to, delivery and distribution charges. You may also be charged a flat daily fee, which you will find in the Customer Disclosure Statement. Upon completion of the Initial Term, this Agreement will automatically renew on a month-to-month basis (the "Renewal Period") with no cancellation fee unless Direct Energy sends you advance written notice of a change. After the Initial Term and during the Renewal Period, Direct Energy will charge you at a variable price per kWh based upon generally prevailing market prices for electricity in the LDU load zone for the applicable period, plus an adder, determined solely by Direct Energy in its discretion. Your variable price will include ancillary charges, cost of capacity, generation, line losses, New York City Utility Tax (when applicable), and other miscellaneous charges. If you are a tax exempt customer, you must provide us with an appropriate exemption certificate before we will waive any assessment and collection of taxes. The amount
>
> customers. Direct Energy may take up to three (3) months following the close of a calendar year to make up any deficiency in the volume of RECs needed from particular generation facilities associated with your Solar Advantage Plan.
>
> **9a. Comfort & Control Plan.** If you are purchasing our Comfort & Control Plan pursuant to this Agreement, you are agreeing to purchase from Direct Energy a product that includes retail electric supply and at least one (1) but no more than three (3) NEST Learning Thermostats. You may request up to three (3) NEST Learning Thermostats; however, Direct Energy may limit the number of NEST Learning Thermostats provided to you in its sole discretion. To be eligible to enroll in the Comfort & Control Plan you: (i) must reside in a single family home; and (ii) have high speed internet service (dial up and mobile internet access is not compatible). The NEST Learning Thermostat works with a significant majority (but not all) of the heating and cooling systems in the market you may check the compatibility of the NEST Learning Thermostat with your heating and/or cooling system at the following website http://support.nest.com/. If you cancel this Agreement after the Rescission Period (as defined in Section 13) but within the Initial Term (as defined in Section 5), then you will be required to pay us a device cost recovery fee in the amount set forth in the Customer Disclosure Statement per NEST Learning Thermostat. You cannot return the NEST Learning Thermostat(s) to avoid the device cost recovery fee(s).
>
> **9b. Back to Business Plan.** If you are purchasing our Back to Business Plan pursuant to this Agreement, you are agreeing to purchase from Direct Energy a product that includes electricity service and at least one (1) but no more than three (3) NEST Learning Thermostats. You may request up to three (3) NEST Learning Thermostats; however, Direct Energy may limit the number of NEST Learning Thermostats provided to you in its sole discretion. To be eligible to enroll in the Back to Business Plan, you must have high speed internet service (dial up and mobile internet access is not compatible). The NEST Learning Thermostat works with a significant majority (but not all) of the heating and cooling systems in the market. You may check the compatibility of the NEST Learning Thermostat with your heating and/or cooling system at the following website http://support.nest.com/. If you cancel this Agreement after the Rescission Period (as defined in Section 13) but within the Initial Term
>
> NYTCRSCE - 091516

*See* Dkt. No. 18-1.

Surely, the requirement that the disclosure be "conspicuous" requires something more than maintaining the same sized font, the same color, and placement in the sixth subsection of the Terms and Conditions. Conspicuous, is defined as "clearly visible or obvious." Black's Law Dictionary 329 (8th ed. 2004). At this stage in the litigation, affording all reasonable inferences in Plaintiff's favor, it is plausible that a reasonable jury could find that Defendant's disclosure in its Terms and Conditions fails to be conspicuous.

Defendant unpersuasively analogizes this case to *Mirkin*; however, the disclosures in that case were clearly more pronounced than in this case. In that regard, the *Mirkin* court described the disclosure in the defendant's terms and conditions in the following way:

> [The terms and conditions] indicate[] in several different places, and using the same font that is used for the rest of the text, that the contract changes to a variable rate plan after the first six months. *Two of those places are called out in a box clearly intended to highlight the most relevant terms to consumers.*

*Mirkin*, 2016 WL 3661106, at *5 (emphasis added).

Here, the Terms and Conditions only mention that the rate will change in one section, and this information is not clearly placed in a position meant to highlight its content.

Similarly, Defendant's Disclosure Statement, reproduced below, fails to provide a conspicuous disclosure that the plan's rate structure will change after the initial period:

| DIRECT ENERGY CUSTOMER DISCLOSURE STATEMENT FOR ELECTRICITY OR NATURAL GAS Schedule A to Terms and Conditions | |
|---|---|
| PRICE[1] | $0.07890/KWH |
| FIXED OR VARIABLE | Fixed rate. |
| RENEWABLE ENERGY PLAN | If this box ☐ is checked, you chose the Renewable Energy Plan! (See Section 7 of the Terms & Conditions for additional details.) |
| COMFORT & CONTROL PLAN | If this box ☐ is checked, you chose the Comfort & Control Plan! |
| LENGTH OF THE AGREEMENT | 12 monthly billing cycles. |
| PROCESS FOR THE RESCISSION OF THE AGREEMENT WITHOUT PENALTY | Customer may contact us at 1-866-348-4194 to rescind within 3 business days. |
| EARLY TERMINATION FEE | $99.00 |
| AMOUNT OF LATE PAYMENT FEE AND METHOD OF CALCULATION | Past due charges may incur a late fee of 1.5% per month or the interest rate posted in your local utility's tariff. |
| PROVISIONS FOR RENEWAL OF THE AGREEMENT | We will send you a renewal notice between 30 and 60 days prior to the end of your Initial Term. This Agreement shall automatically renew for successive month-to-month periods at our standard variable rate plan as per the price applicable to the Terms and Conditions. |

*See* Dkt. No. 18-2 at 7.

The only disclosure in this section merely mentions a variable rate plan and does not mention that Defendant will charge a variable rate per kWH, nor is it conspicuously displayed.

Moreover, the Welcome Letter does not contain any reference to a variable rate per kWH plan but merely points its reader to the Disclosure Statement and Terms and Conditions. Axiomatically, a reference to two documents that plausibly fail to comply with the statutory requirement cannot itself satisfy the same.

Therefore, the Court denies Defendant's motion to dismiss because Plaintiff's First Amended Complaint has plausibly set forth a viable claim that Defendant's Terms and

Conditions, Welcome Letter, and Disclosure Statement fail clearly and conspicuously to disclose all variable charges.

**C.     Unjust enrichment**

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish: '(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendant[ ] to make restitution.'" *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 471 (E.D.N.Y. 2013) (quotation omitted).

Defendant rightfully asserts that "'"the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract [*i.e.*, unjust enrichment] for events arising out of the same subject matter."'" *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 964 (2d Cir. 1998) (quotation and other citation omitted). Furthermore, "[g]enerally, if there is an adequate remedy at law, a court will not permit a claim in equity." *Bongat v. Fairview Nursing Care Ctr., Inc.*, 341 F. Supp. 2d 181, 188 (E.D.N.Y. 2004) (citing *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 144 n.6 (2d Cir. 1999)) (holding that a claim for unjust enrichment must be dismissed because the plaintiff had a viable FLSA claim, among others) (other citations omitted).

Although Plaintiff asserts that his contract with Defendant is void because Defendant never gave him the appropriate notice that his contract would renew, his remedy under the statute is an action for damages pursuant to § 349-d(10). In other words, all of the conduct for which Plaintiff complains Defendant is liable has a statutory remedy, thereby making a claim for unjust enrichment inappropriate under the circumstances. Therefore, the Court grants Defendant's motion to dismiss Plaintiff's unjust enrichment claim.

## IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion to dismiss Plaintiff's First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, *see* Dkt. No. 24, is **GRANTED** in part and **DENIED** in part; and the Court further

**ORDERS** that Plaintiff's unjust enrichment claim is **DISMISSED**; and the Court further

**ORDERS** that this case is referred to Magistrate Judge Baxter for all further pre-trial matters.[6]

**IT IS SO ORDERED.**

Dated: August 14, 2017
Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge

---

[6] As a result of this Memorandum-Decision and Order, the only claim that remains is Plaintiff's claim that Defendant violated New York General Business Law § 349-d(7).